CONNECTICUT OFFICE OF CONSUMER COUNSEL, James F. Meehan, Consumer Counsel, Connecticut Department of Public Utility Control, Peter G. Boucher, Chairman of the Department of Public Utility Control, and Clarine Nardi Riddle, Attorney General, State of Connecticut, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Telephone and Telegraph Company, Intervenor.

No. 1191, Docket 89–4157.

United States Court of Appeals, Second Circuit.

Argued June 6, 1990.

Decided Sept. 20, 1990.

Bill Kowalski, Sr. Staff Atty., Connecticut Office of Consumer Counsel, New Britain, Conn. (Clarine Nardi Riddle, Atty. Gen. for the State of Conn.; Robert S. Golden, Jr., and Rachael Davis, Asst. Attys. Gen., Connecticut Dept. of Public Utility Control, New Britain, Conn., of counsel), for Petitioners.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C. (James F. Rill, Asst. Atty. Gen., Robert B. Nicholson, Robert J. Wiggers, U.S. Dept. of Justice, Washington, D.C.; Robert L. Pettit, Gen. Counsel, and Laurel R. Bergold, F.C.C., Washington, D.C., of counsel), for respondents.

David W. Carpenter, Chicago, Ill. (Peter D. Keisler, Sidley & Austin, Chicago, Ill.; Francine J. Berry, and Judy Sello, Basking Ridge, N.J., of counsel), for intervenor.

Before KEARSE, WINTER and WALKER, Circuit Judges.

WINTER, Circuit Judge:

This petition involves rates for interstate telephone service charged by intervenor American Telephone and Telegraph Company ("AT & T") to its customers in Connecticut. Specifically, we are asked to examine a surcharge collected by AT & T from its Connecticut customers in order to recover the expense of a gross receipts tax imposed on AT & T by the State of Connecticut. Petitioners, various Connecticut state officials, seek review of a decision of the Federal Communications Commission denying petitioners' complaint that the surcharge was unjustly and unreasonably discriminatory in violation of 47 U.S.C. §§ 201(b) and 202(a) and denying their request for an administrative hearing on the complaint. Because the surcharge was a reasonable method of preventing states from singling out telecommunications for taxation in order to transfer a portion of their tax burden to non-residents via rates for interstate telephone service and because there are no material factual issues in dispute, we deny the petition.

## BACKGROUND

### 1. The Calculation of Interstate Rates

The Federal Communications Commission ("FCC" or "Commission") has broad regulatory authority over the formulation of rates for interstate telephone calls. See 47 U.S.C. §§ 152, 201(b) (1982). The rates permissibly charged by a telecommunications company (or "carrier") are based on the costs incurred by that carrier in providing interstate telephone service. For carriers that offer both intrastate and interstate service, the FCC, working with a Federal–State Joint Board, allocates costs between intrastate and interstate service, and itself supervises the recovery of interstate costs, leaving recovery of intrastate costs to the oversight of state regulatory authorities. National Ass'n of Reg. Util. Comm'rs v. FCC, 737 F.2d 1095, 1105 (D.C.Cir.1984), cert. denied, 469 U.S. 1227, 105 S.Ct. 1225, 84 L.Ed.2d 364 (1985) ("NARUC").

The interstate costs isolated by this "separations process" are further segregated into two components. One component, "traffic sensitive" or variable costs, represents costs to the carrier that vary with the intensity of telephone use. The greater the number of calls made, or the longer the duration of any one call, the higher is the traffic sensitive cost. The other component, "nontraffic sensitive" or fixed costs, represents costs that are incurred by a carrier independent of the intensity of telephone use. This would include, for example, the cost of telephone wires, which are equally necessary for one call or a hundred. See NARUC, 737 F.2d at 1104.

A carrier recovers traffic sensitive costs directly from charges to the individual end users of its telephone services. A carrier's fixed costs, however, except for an isolated component that is recovered from end

users, *see NARUC*, 737 F.2d at 1109–10, are recovered through an averaging process. Through the National Exchange Carrier Association ("NECA"), interstate fixed costs are "pooled" nationwide and divided equally amongst all of a carrier's consumers. The purpose of the averaging process is to ensure the existence of a nationwide telecommunications network and to avoid gaps in that network in areas of high fixed costs relative to use.

Generally included in the NECA pool are the taxes—such as property or income taxes—paid by a carrier to the states in which it operates. As a result of the pool system, therefore, taxes paid by a carrier to any one state are usually borne in equal proportion by all of its customers in all of the states in which it operates.

### 2. The Gross Receipts Tax Surcharge

One type of tax that states have imposed on selected businesses is a "gross receipts tax." This tax is levied against all the revenues collected by particular kinds of companies within the state. Ten states, including Connecticut, have assessed a gross receipts tax on the revenue of telecommunications companies.

Some carriers do not include the costs of gross receipts taxes in the NECA pool but rather seek to recover such taxes from their customers in the states that impose the particular tax. By means of a "gross receipts tax surcharge" ("GRTS") these carriers "flow through" the gross receipts tax directly to telephone users in the taxing state. The GRTS collected by AT & T from its Connecticut customers is the subject of the instant litigation.

### 3. Procedural History

In March 1986, AT & T filed a tariff amendment with the FCC to "establish a tariff provision to flow through any utility or telecommunications taxes imposed on AT & T Communications' interstate gross receipts to customers in the jurisdiction imposing the tax." AT & T first collected a GRTS in Florida, and then extended the practice to eight more states, including Connecticut. The FCC denied various petitions for suspension or rejection, and the GRTS took effect. Petitions for review filed in the First and Second Circuits were consolidated in the First Circuit and dismissed in September 1987 on the ground that denial of a motion to suspend a tariff is not a final judgment of an administrative agency and thus is not subject to appellate review. *See Maine Public Advocate v. FCC*, 828 F.2d 68 (1st Cir.1987).

On March 18, 1988, petitioners filed with the FCC the complaint in the instant matter. It alleged that AT & T, in collecting a GRTS in Connecticut, violated 47 U.S.C. §§ 201, 202 and 208, because the GRTS "subject[ed] Connecticut customers to undue and unreasonable discrimination, disadvantage, and prejudice." Specifically, petitioners argued that the GRTS imposed discriminatory prices upon Connecticut consumers for "like" services. They contended that AT & T, by flowing through the Connecticut gross receipts tax directly to Connecticut customers only, while pooling other fixed costs nationwide, forced Connecticut consumers to pay higher rates for interstate telephone services than paid by consumers in the other states in which AT & T operates. This was especially unfair, charged petitioners, in that AT & T's fixed cost of service in Connecticut is lower than the national average and Connecticut consumers thus already bear a larger share of fixed costs than those in "high-cost" states. Separately, petitioners alleged that the GRTS, even if permissible as a matter of principle, was calculated incorrectly because it permitted AT & T to overcollect the cost of Connecticut's gross receipts tax by "double counting" deductible expenses and ignoring the time value of money. As relief, petitioners demanded that AT & T be restrained from imposing the GRTS on Connecticut customers, that AT & T be forced to refund all GRTS monies collected in Connecticut, and that a hearing be held on the complaint. Discovery commenced, and written testimony and briefs were submitted to the FCC.

The Commission dismissed petitioners' complaint. *Connecticut Office of Consumer Counsel v. AT & T Communications*, FCC 89–315 (Nov. 16, 1989) ("Or-

der"), found that the GRTS was a "just and reasonable" method of recovering a gross receipts tax expense. Without such a provision, the Commission reasoned, "states would have an incentive to target telecommunications carriers for special tax burdens and thereby export the cost of the tax to customers in other states." *Id.* at 3. Thus, the rate differential caused by the GRTS was "not unjust or unreasonable discrimination." *Id.* The Commission also ruled that petitioners had proffered no evidence to support their assertion that AT & T computed the GRTS incorrectly. Finally, the Commission ordered that petitioners' motion for a hearing be denied on the ground that there were no relevant questions of fact in controversy that required full evidentiary proceedings. *Id.* at 4.

We agree with the Commission and deny the petition for review.

## DISCUSSION

In reviewing the actions of the Commission,[1] we apply the usual deferential scope of review and will not overturn the Commission's order unless its decision was "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). Furthermore, as a specialized agency, the Commission enjoys broad discretion in carrying out its ratemaking duties, *see, e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 800, 88 S.Ct. 1344, 1377, 20 L.Ed.2d 312 (1968); *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944); *AT & T v. FCC,* 572 F.2d 17, 23–24 (2d Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978), and we will not disturb the decision below if the agency has "provide[d] a coherent and reasonable explanation of its exercise of discretion." *MCI Telecommunications Corp. v. FCC,* 675 F.2d 408, 413 (D.C.Cir.1982).

Petitioners' principal argument is that the GRTS collected by AT & T in Connecticut was unjustly or unreasonably discriminatory in violation of 47 U.S.C. §§ 201(b) and 202(a). We disagree.

The Communications Act of 1934 ("the Act"), created the Federal Communications Commission "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available . . . a rapid, efficient, Nation-wide . . . communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151 (1982). Pursuant to this mandate, Congress empowered the Commission to "make such rules and regulations, and issue such orders . . . as may be necessary." *Id.* at § 154(i).

With respect to rates, the Act broadly provides that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." *Id.* at § 201(b). Similarly, the Act also states:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

*Id.* at § 202(a).

There is no question that the telephone service AT & T provides to Connecticut

---

1. The Commission contends that, as state agencies and officials, petitioners may seek injunctive relief, but not damages, on behalf of citizens. Given that Connecticut has rescinded the gross receipts tax in question and that, consequently, AT & T no longer collects a GRTS in that state, any request for injunctive relief would be moot. The Commission concedes, however, that petitioners have standing to seek damages in their proprietary capacity as rate-paying customers of AT & T formerly subject to the GRTS, and that such standing is sufficient for us to hear the appeal. The question of whether petitioners may seek damages for Connecticut citizens in a representative capacity would arise only if we were to reverse the Commission's order. Because we deny the petition for review, we need not address this issue further.

consumers is "like" the service it provides to consumers in other states. Nor is it disputed that the GRTS is discriminatory in the literal sense that it is paid by Connecticut consumers but not by consumers in many other states. The issue at hand is whether the Commission's determination that the rate differential represented by the GRTS is not unjust or unreasonable is a rational one.

Petitioners argue that the GRTS surcharge undermines the entire process of averaging fixed costs. They contend that allowing AT & T to pass through the costs of the Connecticut gross receipts tax directly to Connecticut consumers via the GRTS is "antithetical to the intent of the ... Act" and "inconsistent with the operation of a pooled-cost system." In their view, the pass-through precedent threatens to unravel the policy of nationwide averaging. Moreover, they contend, it is arbitrary for the Commission to permit local recovery of the GRTS because other types of state taxes levied against carriers—such as property and income taxes—are recovered through nationwide averaging.

We believe the Commission's actions are well within its broad authority. The Act does not require equal rates for all customers. Rather, it requires only that rate differentials between consumers for like service be "just and reasonable." 47 U.S.C. § 201(b). The averaging of fixed costs is thus not compelled by the statute but has been adopted by the Commission as a means of ensuring that basic telecommunications services are available nationwide and will not be foreclosed in areas where fixed costs tend to be high relative to use. The Commission found that the GRTS was a reasonable exception to this policy because without it, states would have an incentive to target telecommunications companies as sources of revenue, with the bulk of the tax incidence ultimately falling on out-of-state residents through nationwide averaging.

The Commission's logic is unassailable. Absent a GRTS, a gross receipts tax is a political and financial windfall to states imposing it because a state's coffers can be filled largely at the expense of persons in other states. Indeed, the record suggests that the prospect of this windfall influenced Connecticut's retention of the gross receipts tax over alternative forms of taxation. *See Order* at 5 n. 19.

As the Commission noted, far from undermining the averaging of fixed costs, the GRTS stabilizes that process by "limiting a state's ability and incentive to shift its tax burden to customers in other states through the averaging process." *Id.* at 3. Without the GRTS, the success of a few states in exporting their tax burden via interstate telephone rates would cause other states to impose their own gross receipts taxes in response. The result would be an upward-spiraling of interstate telephone rates to a level bearing no relation to actual costs of service. Nipping that prospect in the bud is well within the Commission's mandate "to make available ... a rapid, efficient, Nation-wide ... communication service with adequate facilities at reasonable charges." Indeed, an attack on the Commission's ruling in the name of telecommunications consumers is surprising because they as a nationwide group will face ever-rising rates in the absence of a pass-through mechanism.

Furthermore, as the Commission explained, it is reasonable to treat gross receipts taxes and other forms of state taxation differently. Gross receipts taxes are unique in that they target a particular industry—in this case, telecommunications companies. In contrast, property and income taxes are broad-based, and their burdens fall for the most part on residents who are represented in the state's political process. Property and income taxes do not single out an industry that must average its fixed costs nationwide by regulatory order and therefore do not offer an opportunity to transfer the burden of the tax to non-residents. Thus, while a pass-through mechanism is necessary in the case of a gross receipts tax, it is not needed for these other types of taxes.

Petitioners' second argument is that the Commission should have considered AT & T's costs of doing business in Connecticut

because AT & T's cost of serving Connecticut is lower than the national average and that Connecticut consumers already subsidize ratepayers in "high-cost" states. To ask that these consumers also assume the entire burden of Connecticut's gross receipts tax, they argue, allows AT & T to earn an excessive rate of return in Connecticut and unjustly discriminates against Connecticut ratepayers.

In contrast to the earlier contention that the GRTS must be rejected because it threatens to undermine nationwide averaging, this argument attacks the GRTS because it *prevents* the undermining of nationwide averaging. Petitioners would thus have the Commission allow "low-cost" states to impose gross receipts taxes to the point that the fixed costs of service in their states approximate those in "high-cost" states. The Commission was surely correct in rejecting that contention as inconsistent with averaging.

Petitioners offer a third, and far-fetched, argument that the Commission erred in not using disparate impact analysis to consider petitioners' claim of discrimination. They contend that once evidence of differential treatment was presented, the Commission should have assigned AT & T the burden of proving that the GRTS was either a "business necessity" or the least discriminatory means of serving the desired end.

We reject this argument out of hand. Disparate impact analysis is appropriate in the area of employment discrimination against members of racial, ethnic, religious or gender groups. Disparate impact analysis is useful in such cases to identify facially neutral practices that in fact discriminate illegally, *see, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), because such invidious discrimination is often subtle and difficult to detect. It borders on the ridiculous to suggest that such analysis should be imported into this very different area. There is no claim that AT & T has singled out Connecticut ratepayers because it dislikes citizens of that state (or the eight others subject to a GRTS) as a group. It merely seeks to recover what is concededly a cost

of doing business in Connecticut. Disparate impact analysis has no place in this context.

Petitioners also contend that even if the GRTS collected by AT & T from its Connecticut customers is valid in principle, the Commission erred in failing to scrutinize the way in which the surcharge was actually calculated. They complain that AT & T may have been able to "double-recover" a portion of the gross revenue tax levied against telecommunications companies.

The GRTS collected by AT & T recovered two types of gross receipts taxes imposed by Connecticut. The first was a direct 6.5% tax on the revenues of *interstate* carriers. The second was a 9.0% tax on the revenues of local carriers that derived from charges to interstate carriers for access to local telephone networks ("access charges"). Presumably interstate carriers indirectly bore the burden of this second tax in the form of increased access charges.

Connecticut law permitted interstate carriers to deduct access charges in determining their own gross revenue tax liability. In approving the GRTS, however, the Commission allowed AT & T to include a component recovering that portion of access charges paid that were attributable to the tax on local carriers' access charge revenues. Petitioners object on two grounds. First, they argue that conceptually this scheme allows AT & T to double-recover the tax on local carriers' access charge revenues. Second, they argue that the Commission erred in not confirming that the local carrier indeed did pass along the tax on access charge revenues to AT & T. If it did not pass along the tax, argue petitioners, AT & T recovered a cost it did not incur.

We agree with the Commission that because AT & T did not include access charges paid in the base from which it computed recovery of the direct gross revenue tax on its own revenue, no double recovery occurred as a logical matter. We also reject petitioners' second argument. They did not advance this theory before the Commission and offer us no reason now to

believe that the tax on local carriers' access charge revenue was not passed along to AT & T.

Finally, petitioners argue that it was reversible error for the Commission to have denied their request for a hearing on this matter. We disagree. There were no relevant factual issues in controversy and no need for a factual hearing.

Petition denied.