408

MCI TELECOMMUNICATIONS CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Southern Pacific Communications Company, American Telephone and Telegraph Company, Telecommunications Association, Independent Data Communications Manufacturers Association, Inc., American Broadcasting Companies, Inc., et al., Ad Hoc Telecommunications Users Committee, Aeronautical Radio, Inc., et al., Satellite Business Systems, United States Transmission Systems, Inc., Intervenors.

The AD HOC TELECOMMUNICATIONS USERS COMMITTEE, Petitioner

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Southern Pacific Communications Company, United States Transmission Systems, Inc., Independent Data Communications Manufacturers Association, Inc., American Telephone and Telegraph Company, American Broadcasting Companies, Inc., et al., MCI Telecommunications Corporation, Intervenors.

AERONAUTICAL RADIO, INC. and The Air Transport Association of America, Petitioners

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Independent Data Communications Manufacturers Association, Inc., American Telephone and Telegraph Company, United States Transmission Systems, Inc., American Broadcasting Companies, Inc., et al., Ad Hoc Telecommunications Users Committee, Southern Pacific Communications Company, MCI Tele-communications Corporation, Intervenors.

AMERICAN BROADCASTING COMPANIES, INC., et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Telephone and Telegraph Company, Intervenor.

Nos. 81–1052, 81–1272, 81–1273 and 81–1554.

United States Court of Appeals, District of Columbia Circuit.

Argued 26 Feb. 1982.
Decided 13 April 1982.

John L. Bartlett, with whom Howard D. Polsky, James E. Landry and John C. Smith, Washington, D. C., were on the brief for Aeronautical Radio, Inc., et al., and Joseph M. Kittner, Edward P. Taptich, Norman P. Leventhal and Randolph J. May for ABC, et al., Joseph DeFranco for CBS, Inc. and Howard Monderer, Washington, D. C., for NBC, Inc., petitioners/intervenors in Nos. 81–1052, 81–1272, 81–1273 and 81–1554.

William J. Byrnes, with whom Michael H. Bader, Kenneth A. Cox, John M. Pelkey, Joel Rothstein Wolfson, Washington, D. C., Philip S. Nyborg, Arlington, Va., and Ruth S. Baker-Battist, Washington, D. C., were on the brief, for MCI Telecommunications Corp., petitioner in No. 81–1052 and intervenor in Nos. 81–1272 and 81–1273.

John E. Ingle, Counsel, F. C. C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Carl D. Lawson, Counsel, F. C. C., Washington, D. C., were on the brief, for respondents. Jane E. Mago, Counsel, F. C. C., Robert B. Nicholson, Nancy C. Garrison, and James H. Laskey, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.

Jules M. Perlberg, Chicago, Ill., with whom David J. Lewis, Washington, D. C., Alfred A. Green, New York City and Saul Fisher, Bedminster, N. J., were on the brief, for American Telephone and Telegraph Co., intervenor in Nos. 81–1052, 81–1272, 81–1273 and 81–1554.

Daniel A. Huber, Washington, D. C., entered an appearance for Southern Pacific Communications Co., intervenor in Nos. 81–1052, 81–1272 and 81–1273.

Herbert E. Marks and Laurel R. Bergold, Washington, D. C., entered appearances for Independent Data Communications Manufacturers Ass'n, Inc., intervenor in Nos. 81–1052, 81–1272 and 81–1273.

F. Thomas Tuttle, Harold David Cohen and Jack N. Goodman, Washington, D. C., entered appearances for Satellite Business Systems, intervenor in No. 81–1052.

Randall B. Lowe, Washington, D. C., entered an appearance for United States Transmission Systems, Inc., intervenor in Nos. 81–1052, 81–1272 and 81–1273.

Before TAMM and WILKEY, Circuit Judges, and GERHARD A. GESELL,* District Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioners challenge a Federal Communications Commission (FCC) decision prescribing an interim cost allocation methodology for use in setting rates for interstate services provided by American Telephone and Telegraph Company (AT&T). They charge that the FCC failed to explain its reversal of a previous cost allocation decision and violated the "arbitrary and capricious" provision of the Administrative Procedure Act (APA).[1] We reject these contentions and affirm the agency's action.

---

* For the District of Columbia, sitting by designation to 28 U.S.C. § 292(a).

1. 5 U.S.C. § 706(2)(A) (1976).

2. 47 U.S.C. § 201(b) (1976).

## I. BACKGROUND

### A. The Problem of Cost Allocation

The FCC regulates AT&T rates for interstate services, which are generally categorized as MTS (Message Telecommunications Service, or regular long distance service), WATS (Wide Area Telecommunications Service, or bulk rate long distance service), and private line services. A basic principle used to ensure that rates are "just and reasonable"[2] is that rates are determined on the basis of cost. AT&T is permitted to charge rates allowing it to earn a reasonable rate of return on the cost of its services.[3]

Since AT&T offers different services, this regulatory scheme requires that the cost of each service be calculated. This is difficult because many telecommunications costs are common costs, which are necessarily incurred to produce all services. Common facilities and management are examples. The problem is exacerbated when the services offered vary in the degree of competition faced. The FCC has long been concerned that AT&T might "cross-subsidize" its more competitive services by allocating excessive costs to the monopoly services and thereby increasing monopoly rates.

Two basic cost allocation methods have been proposed. One method would calculate the cost of all competitive services on the basis of their long-run incremental costs (LRIC)—the additional costs resulting from adding the service to the existing service network. Under LRIC the common costs would be borne by the initial basic monopoly services; this method thus avoids the problem of determining how much of the common costs should be allocated to individual services. The other method allocates common costs to each individual service on a fully distributed cost (FDC) basis. Each item of common cost is divided among the individual services on some basis indicating each service's contributing share of that

---

3. Another way of stating this is that rates should be set to allow recovery of costs, including the cost of capital.

cost. In making such allocations, several different methods are possible.

B. *Docket 18128*

In Docket 18128 the Commission investigated the lawfulness of AT&T's proposed private line rates and, more generally, the proper method of assessing costs for rate-making purposes. The Commission decided to adopt FDC over LRIC as the ratemaking standard, largely because it feared that LRIC would permit cross-subsidization at the expense of consumers of monopoly services.[4]

The Commission then turned to the question of which FDC method to use. Seven methods had been developed, two of which are relevant here: FDC Method 1 (FDC-1) and FDC Method 7 (FDC-7).[5] FDC-1 is a "relative use" method. The costs of a common facility are assigned to services in proportion to their relative use of the facility. As the relative use changes over time, the cost allocation changes as well. FDC-7 is an "historical cost causation" method. The initial costs of a facility, including the cost of temporary excess capacity, are allocated to those services for which the facility was constructed. Operating expenses are attributed to individual services as accurately as possible. The basic difference between the two methods, then, is that one looks to current use while the other looks to projected future use.[6]

The Recommended Decision of the Common Carrier Bureau Chief chose FDC-1 as the optimal method, primarily because it "has fewer problems relating to judgmental uncertainty since it is based generally upon the accepted and understood methods of the Separations Manual and the process of analysis is considerably simpler than in the other method."[7] The Commission, however, found "that FDC Methods based on historical cost causation are attractive for ratemaking and especially for 'tracking' purposes."[8] The relative use method embodied in FDC-1 was determined to be less useful for these purposes because it would result in current users paying for facilities built for other services' future needs.[9]

The Commission's September 1976 decision did not, however, find FDC-7 acceptable: "Based on the evidence before us, . . . we find that, at best, Method 7's procedures must be made more consistent with a true *historical* causation allocative base, must be less susceptible to managerial interpretation and manipulation, and generally must be clarified and delineated to the Commission's satisfaction."[10] The Common Carrier Bureau was ordered to revise FDC-7 and FDC-1 in accordance with the opinion's guidelines.[11] Methods 1 and 7 would be used to establish a "zone of reasonableness" for ratemaking until acceptable FDC-7 data could be provided.[12]

The Bureau set up a Cost Analysis Task Force, which in conjunction with AT&T produced and then revised a proposed cost manual. The FCC accepted this revised manual conditionally in November 1977. The manual could be used, but it was not approved because problems remained. The Commission announced that it expected to conduct a rulemaking proceeding on adoption of an FDC manual.[13]

---

4. *AT&T*, 61 F.C.C.2d 587, 589 (1976) [hereinafter "*18128*"], *recon.*, 64 F.C.C.2d 971 (1977), *further recon.*, 67 F.C.C.2d 1441 (1978), *aff'd sub nom. Aeronautical Radio, Inc. v. FCC*, 642 F.2d 1221 (D.C.Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981).

5. The other five methods are variations of these two basic methods.

6. *See generally 18128*, 61 F.C.C.2d at 642–43.

7. *AT&T*, 43 Fed.Reg. 4320, 4354 (19 Jan. 1976).

8. *18128*, 61 F.C.C.2d at 645.

9. *See id.* at 643–44.

10. *Id.* at 646 (emphasis in original).

11. *Id.* at 668. Three months were allotted for revision of FDC-1 and FDC-7, followed by five additional months for AT&T to revise its private line tariff offering. *Id.* at 668–69.

12. *Id.* at 648–49.

13. *AT&T*, 66 F.C.C.2d 914, 914–15 (1977).

### C. *Docket 20814*

In Docket 20814 the issue was the lawfulness of AT&T's Multi-Schedule Private Line (MPL) tariff. The Commission had rejected several tariff filings as inconsistent with the *18128* guidelines,[14] and in March 1978 it ordered the Administrative Law Judge (ALJ) hearing the MPL case to expedite his resolution of the question of AT&T's implementation of the *18128* decision.[15]

In March 1979 the ALJ found that AT&T had willfully violated *18128* by continuing to employ a "basic service" philosophy and failing to develop FDC cost procedures. He prepared a suggested cost manual, which allocated costs to twenty-three service categories. The MPL tariffs were rejected.[16]

In September 1979 the Commission issued its decision. It agreed that AT&T's FDC–7 methods were inconsistent with the principles of *18128* and that absent the necessary data the MPL tariffs could not be approved.[17] It neither adopted nor rejected, however, the ALJ's finding that AT&T had intentionally violated *18128*.[18] Most important, it did not adopt the ALJ's manual or any other proposal. Instead, it left the question for a separate rulemaking proceeding which had been instituted two days earlier.[19] As a "temporary partial solution," the Commission ordered that exchange plant investment be allocated among the services in accordance with the Jurisdictional Separations Manual, which is normally used for allocating costs among the state and federal jurisdictions.[20]

### D. *MCI Telecommunications Corp. v. FCC*[21]

On 2 April 1980 this court ordered expeditious resolution by the FCC of a longstanding controversy over AT&T's WATS tariffs. The court declared: "The best must not become the enemy of the good, as it does when the FCC delays making any determination while pursuing the perfect tariff." [22] The decisionmaking schedule accepted by the court required the Commission to adopt a cost allocation manual by early 1981.[23]

### E. *The Rulemaking Proceeding—Docket 79–245*

As noted previously, in September 1979 the Commission instituted a rulemaking proceeding to develop a cost allocation manual.[24] The initial Notice of Inquiry in Docket 79–245 was followed by a Notice of Proposed Rulemaking, issued on 26 June 1980, setting forth a proposed interim cost allocation manual.[25] Unlike the Notice of Inquiry, which had contemplated further revision in the FDC–7 methodology, the proposed interim manual abandoned the FDC–7 methodology for a separations-based methodology similar to FDC–1.

After receiving comments, which were quite unfavorable, the Commission adopted the manual on 6 January 1981. The manual allocates costs among four categories— MTS, WATS, private line services, and access services for other common carriers ("OCC–ENFIA")—on the basis of the Jurisdictional Separations Manual. The categories will be required to earn the system rate of return, and all individual service tariffs

---

14. *See AT&T*, 67 F.C.C.2d 1134 (1978), *recon. denied*, 70 F.C.C.2d 2031 (1979), *aff'd, American Broadcasting Cos. v. FCC*, 663 F.2d 133 (D.C.Cir.1980); *AT&T*, 67 F.C.C.2d 1195 (1978), *recon. denied*, 70 F.C.C.2d 616 (1979).

15. *AT&T*, 67 F.C.C.2d 693 (1978).

16. *AT&T*, FCC 79D–8 (1979) (Initial Decision in Phase I of Docket No. 20814), *reprinted in* Joint Appendix (J.A.) at 26; Initial Decision Cost Implementation Manual, *reprinted in* J.A. at 100.

17. *AT&T*, 74 F.C.C.2d 1, 48 (1979) [hereinafter *"20814"*], *recon. denied*, 85 F.C.C.2d 549 (1981).

18. *20814*, 74 F.C.C.2d at 13.

19. *Id.* at 47.

20. *Id.* at 37–38.

21. 627 F.2d 322 (D.C.Cir.1980).

22. *Id.* at 341–42.

23. *MCI Telecommunications Corp. v. FCC*, No. 79–1119 (D.C.Cir. 30 Oct. 1980) (order).

24. *AT&T*, 73 F.C.C.2d 629 (1979).

25. *AT&T*, 78 F.C.C.2d 1296 (1980).

must continue to be supported by cost data.[26]

The Commission explained that although the historical cost causation approach had been approved in theory in *18128*, no workable method had been developed in practice. AT&T's FDC–7 procedures continued to be unacceptable, and no alternative procedures were available.[27] The crux of the problem was the lack of accurate historical cost causation data.[28] In the short run, therefore, FDC–7 would not work. Given the need to approve AT&T rates, as well as to comply with this court's timetable in *MCI*, the FCC opted for a workable procedure based on jurisdictional separations.[29] Although restricting the allocation to four aggregated service categories was not optimal, it was the best that could be done in the short run; the major objective of *18128*, to prevent MTS services from absorbing costs properly attributable to private line services, would be fulfilled.[30] The proper long-run allocation method would be determined in further proceedings in the same docket.[31]

F. *Petitions for Review*

MCI Telecommunications Corp., a competitor of AT&T, and a number of large users of telecommunications services filed petitions for review. AT&T intervened in support of the Commission. We now affirm.

## II. ANALYSIS

A. *Standard of Review*

Petitioners raise two challenges to the Commission's decision in Docket 79–245. First, the Commission allegedly failed to provide a reasoned explanation for its departure from its earlier decision to implement FDC–7. Second, the Commission allegedly acted arbitrarily and capriciously in adopting an interim methodology very similar to FDC–1, which had previously been found to have flaws.

■ We see no reason to treat these as separate inquiries. In upholding the FCC's *18128* decision, we noted that "the Commission has broad discretion in selecting methods for the exercise of its powers to make and oversee rates" and that "the question is whether the FCC made a reasonable selection from the available alternatives."[32] This limited inquiry under the APA is functionally equivalent to the requirement that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored...."[33] In both instances the critical concern of the reviewing court is that the agency provide a coherent and reasonable explanation of its exercise of discretion. If the agency has done so, the decision may not be disturbed even if the court thinks a different decision would have been more reasonable or desirable.

B. *Rejection of FDC–7 in the Short Run*

■ Petitioners' central objection to the FCC's decision is its departure from the historical cost causation principle approved in *18128*. Two initial points need to be made. First, petitioners err in charging that the *18128* decision was ignored; the Commission held directly that "the methodology prescribed by our Final Decision in Docket 18128 is beyond our ability to effectively administer for the immediate future."[34] Second, it is entirely legitimate for an agency to find that a theoretically sound policy must be abandoned because no

**26.** *AT&T*, 84 F.C.C.2d 384, 397, 408, *recon. denied*, 86 F.C.C.2d 667 (1981).

**27.** *See* 84 F.C.C.2d at 387–90.

**28.** *See* 78 F.C.C.2d at 1306; 86 F.C.C.2d at 669.

**29.** *See* 84 F.C.C.2d at 410.

**30.** *See id.* at 397–98.

**31.** *See id.* at 410.

**32.** *Aeronautical Radio, Inc. v. FCC*, 642 F.2d 1221, 1228 (D.C.Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 311 (1981).

**33.** *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**34.** 78 F.C.C.2d at 1312.

workable method exists for carrying it out. Implementation is as critical to a policy's success as theoretical design. The FCC adopted the interim manual because it met two standards: "First, it is an improvement over existing procedures and, second, it is superior to alternative proposals which can be implemented at this time." [35] These criteria are adequate bases for Commission action. The only question is whether the Commission has adequately explained its decision. We conclude that it has.

The Commission has concluded unequivocally that AT&T's FDC–7 procedures are inadequate. In *20814* the Commission found that these procedures continued to exhibit the "basic service" philosophy condemned in *18128*; in this case the Commission further found them to be far too complex to be implemented, particularly given the Commission's limited resources.[36] Petitioners argue that the FCC was presented with workable proposals for modifying FDC–7. The Commission, however, determined that none of these proposals took into account the fundamental lack of accurate FDC–7 data. It concluded that such information will not become available in the near future, making implementation of FDC–7 "a task which would take at least several years to complete." [37]

We have no grounds for overturning these determinations. The Commission has spent several years working on FDC–7 procedures, and it now feels the method's difficulties are more fundamental than previously assumed. Its emphasis on the importance of adopting a manual immediately was proper, both to comply with the schedule in *MCI* and to ensure that rates be authorized soon. Likewise, its emphasis on its limited resources was justifiable. Though we will not automatically accept an agency's assertion that it is unable to accomplish a task, we find reasonable the Commission's explanation of the difficulties it would face in continuing to revise FDC–7. Again, the Commission is entitled to consider practical as well as theoretical factors.[38]

We also note that the FCC has not repudiated its previous finding that an historical cost causation method is desirable. It intends to continue the search for a cost allocation method which is optimal in theory and in practice.[39] The Commission has

**35.** 84 F.C.C.2d at 386–87.

**36.** *See id.* at 387–90; 78 F.C.C.2d at 1306–07.

**37.** 86 F.C.C.2d at 670. Petitioners suggest that AT&T is to blame for both the lack of data and the inadequate procedures, pointing out that in Docket 20814 the ALJ found that AT&T had willfully sought to circumvent *18128*. The Commission, however, determined that the ALJ had made more findings than necessary, and it declined either to adopt or refute the finding that AT&T had intentionally violated the earlier decision. *20814*, 74 F.C.C.2d at 12–13. One commissioner dissented, arguing that AT&T should be penalized for its failure to comply with *18128*. *Id.* at 50–51 (dissenting statement of Commissioner Fogarty).

We need not enter this thicket. The proceeding at issue here is *79–245*, in which the question was what cost allocation method should now be used, not who is to blame for the failure of earlier methods.

**38.** Petitioners allege that the FCC has failed to explain why in choosing a practical solution it did not adhere instead to the "interim manual" promulgated in *20814*. We do not agree. The interim step taken in that case was to adopt the Jurisdictional Separations Manual for allocation of exchange plant investment. As the Commission explained in its Notice of Proposed Rulemaking, that interim step addressed the problem of AT&T's continued adherence to a "basic service" philosophy. Extension of the separations methodology to interexchange investment addressed a different problem, that of excessive complexity of AT&T's FDC–7 methodology. *See* 78 F.C.C.2d at 1312–13.

**39.** *See* 86 F.C.C.2d at 670. The Commission intends to consider the FDC–7 proposals offered by various parties, and indeed has commented favorably on certain aspects of one of them. *See* 78 F.C.C.2d at 1330–31. This indicates that the FCC did not ignore the comments it received.

Petitioners contend generally that the overwhelming opposition contained in the comments about the proposed rule demonstrates the rule's arbitrariness. They also argue that the Commission's response, which was to note that the beneficiaries of the rule were MTS users who had neither "the individual financial interest nor the expertise to participate," 84 F.C.C.2d at 387, was improper because it was not based on the record. We are satisfied that the Commission gave due consideration to the

determined only that for the immediate future no adequate historical cost method is available. We uphold this limited finding.

## C. Adoption of a Separations-Based Methodology

The FCC found that its interim manual, based on the Jurisdictional Separations Manual, was "the most reasonable and indeed the only possible approach for the immediate future."[40] Petitioners would have us upset this finding on two grounds. First, they assert that it is arbitrary and capricious for the Commission to adopt a methodology so similar to FDC-1, when FDC-1 had been criticized in _18128_. Second, they contend that the Jurisdictional Separations Manual is flawed and inherently unsuited for use in ratemaking. We reject both arguments.

In _18128_ the Commission found that an historic cost causation method, such as FDC-7, was preferable to a relative use method, such as FDC-1.[41] Though the Commission criticized certain aspects of FDC-1, however, it did not reject the method as useless. On the contrary, it stated that "analyses based on relative use do indicate demand patterns and facility assignments which provide valuable evaluative information."[42] More important, the Commission specifically ordered that FDC-1 be used both to help establish a "zone of reasonableness" for past and present rate levels and to serve as a benchmark for future rates.[43]

■ These findings make clear that the Commission never rejected a separations-based method as completely unacceptable.[44]

Rather it found that in theory an historical cost causation method was preferable. After an unsatisfactory experience in attempting to implement FDC-7, however, the Commission finally concluded that the separations methodology "represents a more understandable, verifiable basis for the assignment of plant cost among the broad service categories."[45] The Commission was justified in giving short-run priority to this consideration, particularly in light of its finding that no superior alternative was available.[46]

Petitioners also contend that use of the Jurisdictional Separations Manual is erroneous because that document was not prepared for ratemaking purposes and because it is the result of political compromise. The Commission acknowledged that the Separations Manual had shortcomings, but noted that revision had to come from a Federal-State Joint Board.[47] Moreover, the major criticism of the Separations Manual has been that excessive costs have been allocated to the interstate jurisdiction. Yet, as the Commission argued, "[a]ll serious proposals for cost allocation . . . recognize that the _total_ of costs allocated among interstate services will be determined by the separations process."[48] Thus, this challenge to the Separations Manual is not relevant to proving that the interim cost allocation manual improperly allocates costs _among_ the interstate services.

■ Finally, we note that the "political" nature of the Separations Manual could not by itself invalidate the manual for use in ratemaking. The very problem at issue here—allocation of common costs—arises

---

comments submitted and to the more general public impact of its rulemaking. An agency is not required to mold its decision to accord with the weight of the comments it receives.

**40.** 84 F.C.C.2d at 411.

**41.** _See_ p. 412 _supra._

**42.** _18128,_ 61 F.C.C.2d at 643.

**43.** _Id._ at 648–49, 668.

**44.** That the Chief of the Common Carrier Bureau recommended FDC-1, _see_ p. 412 _supra,_

is further evidence that the method is not inherently irrational.

**45.** 78 F.C.C.2d at 1314.

**46.** "We recognize that this system has drawbacks. However, we are convinced that these drawbacks are more than balanced by the benefits, including ease of implementation, associated with this approach." _Id._ at 1298–99.

**47.** _See_ 84 F.C.C.2d at 391.

**48.** _Id._ at 392 (emphasis added).

precisely because there is no purely economic method of allocation. In this sense *no* Commission choice among the various FDC methods could be justified solely on economic criteria; elements of fairness and other noneconomic values inevitably enter the analysis of the choice to be made.[49] The Commission found that using the Separations Manual might continue to underallocate costs to private line services, at the expense of message services, but that the effect on rates would be in the right direction.[50] This explanation of the consistency of use of the Separations Manual with the decision in Docket 18128 provides an additional indication of the reasonableness of the FCC's decision.

### D. *Adoption of Four Aggregated Service Categories*

The Commission chose to use the Jurisdictional Separations Manual to allocate costs among four categories: MTS, WATS, private line services, and OCC–ENFIA. This means that the interim cost manual will not provide cost allocation for individual services, most of which are private line services. Petitioners argue that it will now be impossible for the FCC to evaluate individual tariff filings because the manual does not provide individual service data. We disagree.

The Commission recognized that its statutory obligations require it to ensure that individual service rates are just and reasonable, and it reaffirmed its intention to make sure that AT&T provides evidence to support its rates.[51] Petitioners err in asserting that this statement is at odds with adoption of the interim manual. All the Commission has done is determine that certain cost allo-

cations shall be made in accordance with a general technique while other cost allocations shall be made in individual cases. Though the Commission hopes to facilitate the ratemaking process through adherence to an allocation manual, there is nothing in the statute requiring that such a manual be adopted. Rates must be just and reasonable, and if the Commission's methodology fails in individual cases petitioners may challenge individual rates.[52]

We find that the Commission adequately explained its decision to adopt only four service categories. The primary reason was that no existing proposal "will properly, or even adequately, allocate costs to individual services or service elements."[53] Moreover, the three major categories adopted will permit the Commission to carry out the objective of *18128*, which was to ensure that message services (MTS and WATS) do not subsidize private line services. It was reasonable for the FCC to decide that such interservice subsidization was a more pressing problem than cross-subsidization among individual private line services. Since there is no existing method for accurately allocating costs among the latter, it would be useless for the Commission to attempt to force each individual service to earn the same rate of return.[54] In addition, as the Commission noted, the increased competition in private line services makes pricing flexibility more important and acceptable than in message services.[55] The Commission was quite justified in taking into account this change in the telecommunications industry since *18128* was decided in 1976.

49. *See id.* at 395.

50. *See id.* The interim manual has resulted in a 16.4% increase in private line rates, which were found to be too low by the Commission in *18128.* The Commission has determined not to suspend or reject the increases. *AT&T*, 86 F.C.C.2d 689 (1981), *appeal dismissed, American Broadcasting Cos. v. FCC*, 662 F.2d 155 (2d Cir. 1981).

51. *See* 84 F.C.C.2d at 397.

52. *See* 86 F.C.C.2d at 673.

53. 84 F.C.C.2d at 397. *See also* 78 F.C.C.2d at 1313; 86 F.C.C.2d at 673.

54. *See* 86 F.C.C.2d at 673. The Commission is proceeding with an investigation of the structure of private line rates.

55. *See* 84 F.C.C.2d 397–98; 78 F.C.C.2d at 1297, 1308.

### III. CONCLUSION

We are convinced that the Commission has given due consideration to the problems before it and that it has arrived at a reasonable solution. Petitioners obviously disagree strenuously with the policy chosen, but that cannot serve as a basis for mandating a different outcome. The Commission has provided ample explanation of its decision, and we cannot find the decision to be arbitrary or capricious.

*Affirmed.*