The **OHIO BELL TELEPHONE COMPANY** (90–3146/3688); **Cincinnati Bell Telephone Company** (90–3162/3707); **South Central Bell Telephone Company, Southern Bell Telephone and Telegraph Company and Bellsouth Telephone Companies** (90–3833); **the Southwestern Bell Telephone Company** (90–3832); **and Wisconsin Bell, Inc.** (90–3354/3831), Petitioners,

v.

### FEDERAL COMMUNICATIONS COMMISSION, Respondent.

Nos. 90–3146, 90–3162, 90–3354, 90–3688, 90–3707, 90–3832 and 90–3833.

United States Court of Appeals, Sixth Circuit.

Argued July 23, 1991.

Decided Nov. 21, 1991.

---

William B. Barfield (briefed), R. Frost Branon, Jr. (briefed), Atlanta, Ga., Thomas Welch, J. Manning Lee, Washington, D.C., for Bellsouth Telephone Companies, Southern Bell Tel. and Tel. Co., and South Central Bell Telephone Co.

William C. Sullivan, Richard C. Hartgrove (briefed), Joseph E. Cosgrove, Jr., Michael J. Zpevak (briefed), St. Louis, Mo., for Southwestern Bell Telephone Co.

Donald W. Boecke, Washington, D.C., for New York Telephone Co., and New England Tel. and Tel. Co.

Frank W. Krogh, Donald J. Elardo, Washington, D.C., for MCI Telecommunications Corp.

Genevieve Morelli, Competitive Telecommunications Assoc., Gen. Counsel, Washington, D.C., for Competitive Telecommunications Assn, Competitive Telecommunications Assoc.

David W. Carpenter, James S. Whitehead, Sidley & Austin, Chicago, Ill., Francine J. Berry, David P. Condit, Basking Ridge, N.J., for American Tel. and Tel. Co.

Cathrine G. O'Sullivan, Andrea Limmer, U.S. Dept. of Justice, Antitrust Div., Nancy C. Garrison, U.S. Dept. of Justice, Chief Appellate Section, Antitrust Div., Washington, D.C., for U.S.

Donald M. Rose (argued and briefed), Frost & Jacobs, Cincinnati, Ohio, Alfred Winchell Whittaker (argued and briefed), Katherine Zeitlin Duckers, Kirkland & Ellis, Washington, D.C., Floyd S. Keene (briefed), JoAnne G. Bloom (briefed), Michael T. Mulcahy (briefed), Chicago, Ill., Donald W. Morrison (briefed), Ohio Bell Telephone Co., Cleveland, Ohio, for Ohio Bell Telephone Co.

John W. Bogy, James P. Tuthill, San Francisco, Cal., Stanley J. Moore, Washington, D.C., for Pacific Bell, and Nevada Bell.

James S. Blaszak, Charles C. Hunter, M. Christina Carter–Pena, Gardner, Carton and Douglas, Washington, D.C., for Ad Hoc Telecommunications Users Committee.

Alfred Winchell Whittaker (argued and briefed), Katherine Zeitlin Duckers, Kirkland & Ellis, Washington, D.C., Floyd S. Keene (briefed), JoAnne G. Bloom (briefed), Michael T. Mulcahy (briefed), Chicago, Ill., for Wisconsin Bell, Inc.

Donald McG. Rose (argued and briefed), William D. Baskett III (briefed), Thomas E. Taylor (briefed), Susan W. Kamp (briefed), Frost & Jacobs, Cincinnati, Ohio, for Cincinnati Bell Telephone Co.

Richard L. Thornburgh, Atty. Gen., Cathrine G. O'Sullivan, Andrea Limmer, U.S. Dept. of Justice, Antitrust Div., Linda L. Oliver, Robert L. Pettit (briefed), Laurence N. Bourn (briefed), John E. Ingle (argued and briefed), Office of the Gen. Counsel, F.C.C., Washington, D.C., for F.C.C. and U.S.

Before: BOGGS and NORRIS, Circuit Judges; and HULL, Chief District Judge[*].

BOGGS, Circuit Judge.

Petitioners and supporting intervenors are a group of local and regional telephone companies. Pursuant to 28 U.S.C. § 2341 and 47 U.S.C. § 402(a), they petition this court to review the lawfulness of an order of the Federal Communication Commission ("the Commission" or "the FCC") requiring them to refund purported "overearnings" in the "special access category" of earnings for the 1985–86 and 1987–88 two-year monitoring periods. *See Investigation of Special Access Tariffs of Local Exchange Carriers*, 5 F.C.C. Rcd. 412 (Memorandum Opinion and Order of November 28, 1989) [hereinafter *Refund Order*], *reconsidered by Investigation of Special Access Tariffs of Local Exchange Carriers*, 5 F.C.C. Rcd. 4861 (Memorandum Opinion and Order of July 25, 1990) [hereinafter *Refund Order Reconsideration*]. For reasons given below, we vacate the Commission's order.

I

The factual background of this case is the break-up of the Bell System. Its legal framework is the Communications Act, 47 U.S.C. § 151 *et seq.*, the FCC's organic act. The Act confers on the Commission the authority to regulate telecommunications rates charged by common carriers and establishes the procedures for exercising that authority. *Id.* § 201 *et seq.* A review of the legal framework before we state the facts will facilitate understanding the issues.

The Communications Act provides that the rates and practices of carriers subject to FCC jurisdiction must be just and reasonable, *id.* § 201(b), and free of undue discrimination or preference, *id.* § 202(a). The primary responsibility for establishing rates lies with the common carriers. Each of them must file a schedule of tariffs with the FCC, *id.* § 203(a), and charge customers accordingly, *id.* § 203(c).

The Act provides for two procedures for policing the rates charged by carriers. *See id.* §§ 204 & 205. When a new or revised rate schedule is filed, the carrier must wait at least ninety days before putting the schedule into effect. *Id.* § 203(b)(1). The purpose of this waiting period is to allow the Commission to investigate whether the rate is just and reasonable. If the Commission does not anticipate that its investigation will be completed within the 90–day period, it may suspend for ninety days the date the proposed rate schedule is to go into effect. *Id.* § 204(a)(1). If the investigation into the lawfulness of the rates has not concluded within the prescribed suspension period, the tariffs go into effect automatically, but the Commission *may* issue an order requiring the carrier to keep "accurate accounts of all amounts received by reason of such charge.... [U]pon completion of the hearing and decision, the [FCC] may ... require the interested carrier to refund ... to persons in whose behalf such amounts were paid, such portion of such charge for a new service or increased charge as by its decision shall be found *not* justified." *Id.* § 205(a).

---

[*] The Honorable Thomas G. Hull, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

The second procedure for policing rates is used in cases where the lawfulness of a rate already in effect is at issue. Section 205 of the Act authorizes the Commission, on its own initiative or on complaint, to order an investigation and hearing into any rate charged by a carrier. The purpose of the procedure is to determine what charges are "just and reasonable" and "to be thereafter observed." In other words, the relief authorized by § 205 is prospective only. Carriers subject to the Commission's authority under § 205 are merely required to charge appropriate rates in the future. The section does not authorize refunds. "An examination of the statute as a whole makes crystal clear that the schedule filed by a carrier serves as the foundation by which Congress' regulatory scheme achieves stability, predictability and the protection of the public interest. Once the schedule is filed and allowed to go into effect, carriers ... and consumers ... are entitled to rely on it, except for the one special situation addressed [by § 204]." *American Tel. & Tel. v. Federal Communications Comm'n*, 836 F.2d 1386, 1394 (D.C.Cir.1988) (Starr, J., concurring). Only § 204 of the Communications Act authorizes refunds. It does so only when new tariffs are filed with the Commission, and the Commission has not completed its investigation into their lawfulness within the 90–day waiting period specified in § 203(b)(1).

■ When the Commission determines whether rates filed with it are just and reasonable, costs are generally the principal points of reference. *MCI Telecommunications Corp. v. Federal Communications Comm'n*, 675 F.2d 408, 410 (D.C.Cir. 1982). A carrier is permitted to charge rates that allow it to recover costs and earn a reasonable rate of return on its invested capital. *Ibid.* Another way of stating this is to say that lawful rates will permit a carrier to recover all of its costs, including the cost of capital. *Id.* at 410 n. 3. Therefore, as part of its regulatory task, the Commission sets the rate of return on capital that a carrier may charge its customers. *See, e.g., Nader v. Federal Communica-*

*tions Comm'n*, 520 F.2d 182, 191–92 (D.C.Cir.1981). The carrier then calculates its rates so that the projected revenues will cover projected operating expenses, including the authorized return on capital. *A.T. & T. v. F.C.C.*, 836 F.2d at 1388.

■ If the projections that underlie this calculation thereafter prove correct, *i.e.*, if estimates of labor and other cost elements and of consumer demand prove accurate, then the carrier's net revenue will match the authorized rate of return precisely. *Ibid.* This rarely occurs, however. When a carrier earns more than the targeted rate of return, the remedy in the past has not been to order refunds. *A.T. & T. v. F.C.C.*, 836 F.2d at 1394. The remedy is prospective relief under § 205. In other words, if a carrier is consistently earning in excess of the targeted rate of return, the Commission may use § 205 procedures to require the carrier to lower its rates. As a general rule, earnings in excess of the authorized rate of return are not subject to refund orders, but rates a carrier charges in the future may be lowered if there is a history of consistent overearnings. *American Public Gas Ass'n v. Federal Power Comm'n*, 567 F.2d 1016, 1057 (D.C.Cir. 1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

For the time being, the foregoing is a sufficient discussion of the law applicable to this case. We turn now to the facts.

## II

The overarching question in this dispute is how much local exchange carriers ("LECs"), such as the petitioners, may charge for interstate "special access" services. LECs provide services to the ordinary ultimate consumer of telecommunications services, *e.g.*, the individual residential telephone user, through "switched access." "Special access" is used by long-distance carriers, *e.g.*, A.T. & T., MCI, and Sprint, and other large business customers, who require full-time, dedicated communications between two discrete points. "Special access" is also called "interexchange access."

Access charges are the means whereby local telephone companies recover from interstate customers their share of the cost of the local plant that is used in the origination and termination of interstate calls. *National Assoc. of Regulatory Util. Comm'rs v. Federal Comm. Comm'n*, 737 F.2d 1095, 1103–05 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985). After the break-up of the Bell system, it became necessary for the FCC to establish an interstate access charge plan regulating how much local telephone companies could charge long-distance carriers and others for access services. Accordingly, in 1983, the Commission promulgated Part 69 of its rules, which established a comprehensive plan for the regulation of interstate access charges. *See* 47 C.F.R. §§ 69.1 *et seq.*

Part 69 rules provide for two basic forms of interstate access, switched access and special access, and specify how interstate investment and expenses are to be divided between those categories for the purposes of setting rates. *See generally id.* §§ 69.1 *et seq.* For switched access, the rules establish specific rate elements and require carriers to target the rates for each element to earn no more than the authorized rate of return. *See, e.g., id.* § 69.107. With respect to special access services, the rules provide for a different regulatory structure. Among the devices the FCC uses to regulate special access services is limiting the rate of return in the special access category of earnings. *See* 47 C.F.R. § 65.702(b). Typically, special access customers require a unique package of special access services, *e.g.*, alarm services, video services, and telegraph services. They are charged for a unique package of component services, rather than for a single, complete service. The FCC's access charge rules do not mandate any particular rate structure. In other words, they do not require the telephone company to target either individual rate elements or services within the special access category to earn any specific rate of return. Nonetheless, the Part 65 rules do require LEC's to target special access rates in the aggregate to produce a return for the special access category which is no greater than the overall rate of return established by the Commission. *Id.* § 65.702(b).

In October 1983, petitioners filed tariffs for special access services, as they were required to do by the pertinent Part 65 rules and 47 U.S.C. § 203. The tariffs included "strategic pricing" for high-capacity ("Hi–Cap") services. A high-capacity telephone line is one that is capable, for example, of carrying 32 voice conversations, instead of just one, as a voice-grade line might. Strategic pricing entails setting prices to achieve strategic market objectives rather than merely to recover costs. Petitioners had a number of reasons for wishing to price their Hi–Cap services strategically. Those reasons included deterring uneconomic service by-pass, "managing migration demand," and preventing "churn" in replacement facilities. *See generally Investigation of Special Access Tariffs of Local Exchange Carriers*, 4 F.C.C. Rcd. 4797, 4801 (Memorandum Opinion and Order of December 1, 1988) [hereinafter *Strategic Pricing Order*]. We confine ourselves to a cursory explanation of these objectives. A fuller account is not necessary for present purposes.

Ever since the introduction of access charges, switched access rates have been burdened with rates set high enough to recover a portion of local exchange costs assigned to local telephone companies after the Bell break-up. As a result, high-capacity services became cheaper for a number of telephone users, even though their actual telephone use did not justify the use of such technologically sophisticated equipment. This situation might result in users bypassing existing switched access facilities in order to take advantage of the lower rates. A number of undesirable consequences might follow. Demand would tend to "migrate" from switched access services to special access, and telephone users would tend to "churn" their facilities, *i.e.*, to replace technologically less sophisticated equipment with technological advanced equipment in order take advantage of the lower Hi–Cap rates, but without other need or justification. The most undesirable con-

sequence would be that voice-grade services would be underused and the investment in them would be at least partially wasted. Strategic pricing was designed to narrow the difference in pricing between the two systems, in order to keep voice-grade lines more fully employed.

The tariffs submitted for FCC approval in October 1983, which set prices strategically because of these considerations, were investigated and found unlawful. They never went into effect. In March 1984, new tariffs were submitted, but they too were found wanting, after an investigation. Strategic pricing was not the cause. In fact, it was not until March 1985 that the Commission took official notice of strategic pricing for Hi–Cap services and indicated its disposition to investigate them. *See Investigation of Access and Divestiture Related Tariffs* (CC Docket No. 83–1145, Phase I and Phase II, Part 1), 50 Fed.Reg. 12637 (1985) [hereinafter *March 1985 Investigation Order*].

A third tariff for access charges was filed with the Commission in April 1985. It also was based on strategic pricing. It was subjected to investigation, as its two predecessors had been, and was suspended for one month. *See* 47 U.S.C. § 204(a). In April 1985, this tariff was permitted to go into effect. *See Investigation of Access and Divestiture Related Tariffs* (CC Docket No. 83–1145, Phase I and Phase II, Part 1), 102 F.C.C.2d 1007 (1985). The investigation of these tariffs was not completed when the one-month suspension expired. Nonetheless, the Commission permitted them to go into effect. Because of the concern with Hi–Cap strategic pricing that the Commission expressed in its *March 1985 Investigation Order*, it specified that it would investigate further the strategic pricing of Hi–Cap services. *Investigation of Access and Divestiture Related Tariffs*, 102 F.C.C.2d at 1016, ¶ 22. In addition, the order permitting the rates to go into effect specified that "[the Commission's] allowance of the revised rates is accordingly conditioned on the requirement that those rates earn overall no more than the authorized rates of return." *Id.* at 1008, ¶ 3. For this reason, the Commission ordered

petitioners to account for the amounts received from special access customers, pursuant to 47 U.S.C. § 204. 102 F.C.C.2d at 1036–37, ¶¶ 66–67. The Commission's order also indicated that refunds would be ordered if earnings exceeded the permitted rates of return. *Ibid.* Unfortunately, however, the Commission had not yet completed its investigation into rates of return when it issued the order. *Id.* at 1008, ¶ 3. There were thus no guidelines then in place to determine whether the rates of return targeted in the tariffs then going into effect were within permissible limits, or actually would result in just and reasonable rates.

The Commission delegated to its Common Carrier Bureau the task of determining reasonable rate of return targets for special access services and otherwise investigating strategic pricing. The Bureau began its work in May 1985. The job was not completed until December 1988. *See Investigation of Special Access Tariffs of Local Exchange Carriers*, 4 F.C.C. Rcd. 4797, 4803 ¶ 58 (1988). The December order resulting from the Bureau's investigation found strategic pricing legitimate as a general proposition and established five guidelines for determining whether individual strategically-determined rate schedules were "just and reasonable" as required by law. The guidelines are:

1. *Hierarchy:* Rates for less costly services cannot be higher than those for more costly services.

2. *The Public Interest:* Subelement rates must further a specific public interest, such as managing demand migration between substitutable services and discouraging inefficient use of the network.

3. *Customer Choice:* Strategically-priced rates cannot unreasonably hinder a customer's choice of access service, the development or implementation of new technologies, or the efficient use of the network.

4. *Unrestricted Availability:* Strategically-set rates must be integrated into the special access rate structure with no restrictions on customers or users.

5. *Earnings:* Carriers cannot deviate from the cost allocation or rate of return requirements established in Parts 65 and 69 of the Commission's rules.

*Ibid.* Along with these guidelines, the Commission also published guidelines establishing permissible target rates of return. *See Refund Order, supra,* 5 F.C.C. Rcd. at 412 ¶ 7.

While the Bureau developed its Strategic Pricing Guidelines during the period April 1985 to December 1988, petitioners filed tariffs with the Commission every year, as Part 69 of the FCC rules required. It is the rates charged under these filings that are the subject of the Commission's refund order now under review by this court.

The first of the tariffs was filed by petitioner in July 1985. They were to take effect in October 1985. These rates were never suspended, but the order permitting them to go into effect despite protests said that "[t]he public will be protected by the existing accounting orders which we will extend to the filed tariffs in the case of special access, and by our authority to order necessary refunds and corrections." *Annual 1985 Access Tariff Filings,* 59 Rad.Reg.2d 1, 14–15 ¶¶ 62–64 (Order of September 30, 1985). The existing accounting order referred to is the one imposed by the order of April 1985 permitting the rates then before the Commission to go into effect.

In October 1986, petitioners again filed a tariff providing for strategic pricing of Hi-Cap services. These rates were not suspended nor subject to an accounting order. The order permitting them to go into effect stated that these rates were subject to the continuing investigation into strategic pricing. *Annual 1987 Access Tariff Filings,* 2 F.C.C. Rcd. 280, 284 (1986). It ordered petitioners to keep accurate accounts of amounts received after January 1, 1987 for strategically-priced Hi-Cap services, and characterized this requirement as an extension of the accounting order initially imposed by the order of April 1985. *Id.* at 290.

In October 1987, petitioners again filed new special access tariffs with the Commis-

sion. These rates were suspended for two months, finally taking effect in March 1988. No accounting order was imposed. *Annual 1988 Access Tariff Filings,* 3 F.C.C. Rcd. 1281, 1295, 1299, ¶¶ 3, 116, 141. Nonetheless, the language of the order states that the rates taking effect are subject to the continuing investigation into strategic pricing. *Ibid.*

In sum, the Commission's treatment of the rates filed during its investigation of strategic pricing did not scrupulously comply with the procedures in § 204. Rates filed in July 1985 were neither suspended nor subject to their own accounting order, although the Commission considered that a previous accounting order, imposed after a suspension, applied to these rates. Rates filed in 1986 also were not suspended, but the Commission considered these rates subject to the continuing investigation into strategic pricing and imposed an accounting requirement. Rates filed in 1987 were suspended, but not subjected to an accounting order. The position of the Commission is that the accounting requirement imposed in 1986 applied to these rates because the Commission had not removed the 1986 requirement.

Despite these possible irregularities in § 204 procedures, the Commission ordered a partial refund of rates charged under these schedules. In its *Refund Order* of November 28, 1989, the Commission reviewed the special access rate schedules filed by the petitioners pursuant to Part 69 of the Commission's rules in order to determine whether the scheduled rates complied with the guidelines promulgated by the Commission in its *Strategic Pricing Order* of December 1988. The Commission determined that petitioners' tariffs were reasonable and had complied with all the strategic-pricing guidelines except one, which we have named the earnings guideline. *See* p. 9, *supra.* The departure of petitioners' earnings from the guidelines is the reason the Commission has ordered refunds.

The Commission's practice is to review earnings over a two-year period. The rates of some of the petitioners were found wanting because in some of the two-year

periods, their earnings had exceeded the targeted rate of return. For example, in the earnings period 1985–86, South Central Bell's Alabama operations had earned a 13.90% return, even though the authorized rate of return was 13.25%. Ohio Bell had earned 13.27% in the 1987–88 earnings period, even though the authorized rate of return was 12.40%. The Commission stated that these overearnings "violated" the *Strategic Pricing Order* and the guidelines for permissible rates of return. *Refund Order*, 5 F.C.C. Rcd. at 413 ¶ 7. Having made this determination, the Commission ordered refunds, or more exactly, it ordered each petitioner to establish escrow funds equal to its refund liability plus interest. *Id.* at 413 ¶ 12.

The *Refund Order* did not suggest that petitioners targeted their rates so as to make more than the permissible rates of return. As petitioners point out, tariffs are set with a certain rate of return in mind, but whether or not earnings will reflect this rate of return is determined by factors that may be beyond petitioners' control. The Commission does not dispute this point. Because of the unpredictability of the actual return on investments, there were some years in which a local telephone company might earn more than the permissible rate of return, other years in which it might earn less. For example, although BellSouth's South Carolina subsidiary earned a return of 13.03% in the 1987–88 period, when the authorized rate of return was 12.40%, it earned only 10.01% in the 1985–86 period, when the authorized rate of return was 13.24%. The Commission's refund order would require BellSouth's subsidiary to make a refund of overearnings for the 1987–88 period, but would not permit the company to set these overearnings off against the underearnings of the 1985–86 period.

In addition to the foregoing, the fact that certain local telephone companies are grouped together under regional holding companies provides additional reasons for petitioners to complain about the provisions of the *Refund Order*. For example, both Ohio Bell and Michigan Bell are part of Ameritech. In 1987–88, the Commission's permissible rate of return was 12.40%. During that time, Ohio Bell earned 13.27%, while Michigan Bell earned only 6.03%. Nonetheless, the *Refund Order* required Ohio Bell to refund its overearnings and did not permit Ameritech to set Michigan Bell's underearnings off against Ohio Bell's overearnings. Petitioners' essential grievance in this case is that it is arbitrary and unfair to require them to make refunds in the good years, while denying them setoffs in the bad years.

## III

Petitioners contend that the Commission's *Refund Order* is contrary to law, in excess of its statutory authority, and arbitrary and capricious. According to petitioners, the order is contrary to law because it is, in effect, a retroactive application of strategic pricing guidelines. Petitioners argue that applying the guidelines retroactively amounts to retroactive ratemaking, which is outside the scope of the Commission's authority under the Communications Act. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981).

Petitioners next contend that the Commission did not follow the appropriate procedures in issuing the *Refund Order*. According to the petitioners, Communications Act procedures require the Commission to suspend a rate schedule explicitly and then explicitly subject the carrier filing it to an accounting order before it may order refunds. As we have pointed out above, this two-step procedure was not followed in the case of the rate schedules subject to the refund order. Some were never suspended; others were never explicitly subjected to an accounting order. Because of the Commission's purported failure to observe all of the procedural requirements of § 204, petitioners assert that the Commission exceeded its statutory authority in ordering refunds pursuant to that section of the act. Petitioners insist that something more than procedural propriety is at stake. They maintain that retroactive rate-making is not favored by the law because it upsets the balance between the utilities and the

consumer established in the act. *See, e.g., United States v. SCRAP*, 412 U.S. 669, 697, 93 S.Ct. 2405, 2421, 37 L.Ed.2d 254 (1973); *United Gas Pipeline Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 113, 79 S.Ct. 194, 200, 3 L.Ed.2d 153 (1958). Retroactive rate-making is authorized only in one circumstance, according to petitioners. That circumstance, say petitioners, is the failure of the Commission to complete its investigation of new rates filed with it within the 90–day waiting period prescribed by § 203 of the Act. Because the § 204 exception to the prohibition against retroactive rate-making is a narrow one, petitioners conclude, the authority to order refunds can only be exercised if the procedures specified are followed precisely. If they are not followed exactly and refunds are ordered, as in this case, petitioners contend that the Commission has engaged in retroactive rate-making in excess of its statutory authority.

Petitioners' final argument is that by ordering refunds of overearnings under the strategic-pricing guidelines, the Commission acted in a manner inconsistent with its own rate of return prescriptions. Petitioners contend that because of this inconsistency, the refund order is arbitrary and capricious. We agree with petitioners' third argument and consider it dispositive of the case. For this reason, we shall not consider the first two arguments.

### IV

■ Under the "arbitrary and capricious" standard, an appellate court's scope of review is narrow. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 816, 28 L.Ed.2d 136 (1971). The Commission must articulate a rational connection between the facts found and the choice made. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct.

239, 246, 9 L.Ed.2d 207 (1962). An appellate court may not supply a basis for the Commission's action that the Commission itself has not given. *Securities Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

■ Petitioners rely primarily on *A.T. & T. v. F.C.C.*, *supra*, to argue that the Commission's order is arbitrary and capricious. The case involved a refund order similar to the one in this case. As the *A.T. & T.* court explained,

> [u]nder the refund rule [in this case], the Commission will set a target rate of return, and will require carriers to file rates reflecting the target, for a subsequent two-year period. The Commission will review the filed rates to determine whether they are just and reasonable, and in particular whether the carrier has properly incorporated the target return the Commission has set. This process does not significantly differ from what the Commission and the carriers have done in the past. But the refund rule also requires each carrier to compare the revenue it actually received during the two-year period with the revenue that, all else being equal, achievement of the target return plus a "buffer" increment would have produced during that same period. If the carrier received more revenue than the target with the buffer would have produced, it must refund the excess to its customers.
>
> In addition, the Commission's rule requires the carrier to apply this refund procedure not only to the revenue from its interstate operation taken as a whole, but also the revenue from certain segments of the carrier's operations. Each of these segments employs rates that, by Commission rule, incorporate the target return. An excess of revenues in any one of those segments triggers a refund; a revenue shortfall below the target return in one segment may not offset an excess in another segment.

*A.T. & T. v. F.C.C.*, 836 F.2d at 1389 (citations and footnotes omitted).

The *A.T. & T.* court did not deny the Commission's authority to regulate rates by establishing rates of return to be incorporated into a carrier's rates. *Ibid.* (citing *Nader v. F.C.C.*, 520 F.2d at 203–04). Nonetheless, the court held the refund mechanism at issue to be arbitrary and capricious because it undermined the Commission's own policies in establishing rates of return. 836 F.2d at 1390 ("[T]he Commission's refund rule cannot stand because it is inconsistent with the rate of return prescription it purports to enforce."). The position the Commission took before the *A.T. & T.* court to explain its rate of return policy was that the rates of return established as permissible by Commission guidelines "embod[y] the Commission's best estimate, in light of evidence available to it, of the earnings needed to retain the carrier's capital investors and to attract additional required investments." *Ibid.* Hence, a rate of return authorized by the Commission is both a minimum and a maximum, representing a balance between investor and consumer interests. It is a minimum because it is the smallest rate of return possible, consistent with the need to attract capital; it is a maximum because it represents the highest rate of return a carrier may target in determining rates. *Ibid.* If rates exceed the permissible rate of return considered as a maximum, the consumer suffers, because he pays too much. *Ibid.* If rates fall below the permissible rate of return considered as a minimum, the investor (and, ultimately, investment in the carrier) suffers, because the investor is not receiving an adequate return on capital. *Ibid.* For these reasons, an order requiring the refund of overearnings in every category of cost allocation, while ignoring underearnings, was bound, over the long run, to assure that rates of return would always average below the minimum needed to attract investors. *Ibid.* Because this result was inevitable, it violated the policy that the Commission purported to effect when it established permissible rates of return. *Ibid.* On this basis, the *A.T. & T.* court found the refund order arbitrary and capricious.

Plainly, the case now before this court runs virtually on all fours with *A.T. & T.* The same analysis applies. If petitioners are required to refund overearnings in the special access category of earning while being precluded from setting off underearnings against overearnings, in the long run petitioners will earn less than the rate of return the Commission deems adequate and necessary to attract investors. Hence the refund order before this court can only be considered arbitrary and capricious.

To defend itself against the application of *A.T. & T.*'s reasoning to this case, the Commission offers little of substance either by way of argument or authority. The Commission cites *New England Telephone & Telegraph Co.*, 826 F.2d 1101 (D.C.Cir. 1987), *cert. denied*, 490 U.S. 1039, 109 S.Ct. 1942, 104 L.Ed.2d 413 (1989). That case establishes that the Commission may regulate rates by establishing rates of return to be incorporated into rate schedules. It does not address the issue of *A.T. & T.* or this case. This issue is whether a refund rule that requires refunds of overearnings but ignores underearnings is consistent with Commission policy in establishing rates of return. In short, *New England Tel. & Tel.* is largely irrelevant to the dispositive issue of this case.

The Commission also tries to distinguish this case from *A.T. & T.* on the facts. In *A.T. & T.*, the refund order established a permanent and automatic mechanism for refunding overearnings. The Commission argues that this case is different from that one because the refund order under review here does not provide for automatic refunds. Rather, the Commission maintains, the refund order in this case represents a reasoned, one-time, approach to overearnings due to strategic pricing. We are unable to see the foundation for this claim. The only justification the Commission offers for ordering refunds is that "strategic pricing could never justify overearnings at the special access category level." *Refund Order*, 5 F.C.C. Rcd.2d at 413 ¶ 10. We are not told why this is so. Nor are we told what is special about the special access category of earnings so that the Commission can ignore the fact that over time the

application of this principle must result in underearnings in this category. The Commission's brief attempts to justify this by allusions to the Commission's responsibility for ensuring that "rates are just and reasonable, and do not produce unreasonable discrimination ... by not allowing a carrier to offset excessive rates to one customer with deficient rates to another." This goal is admirable, but its relevance to the matter at hand is not very clear. We are not told how it is advanced by the *Refund Order* currently under review. What is more important, there is no such justification in the order itself. The order offers us no findings of fact identifying those who have been charged · excessive rates and those who have been charged deficient rates, and it does not tell us how its provisions address the imbalance between the two. Under *Chenery, supra,* we cannot accept such a rationale for the order, even if we were convinced of its validity.

For the foregoing reasons, we find that the *Refund Order* submitted for review is inconsistent with Commission policies establishing permissible rates of return. We hold that the order is, for that reason, arbitrary and capricious. Accordingly, we vacate it.